## 𝕾taunton

ALBERT L. RUBIN AND ROSE M. RUBIN V. BERTRAM GOCHRACH AND FRANK L. SIMKINS.

September 3, 1947.

Record No. 3216.

Present, Hudgins, Gregory, Eggleston, Spratley and Buchanan, JJ.

The opinion states the case.

*Albert V. Bryan, Howard W. Smith, Jr., John Barton Phillips* and *T. Brooke Howard,* for the appellants.

*Isador Shapiro, James N. Colasanto* and *Dennie R. Ayres*, for the appellees.

SPRATLEY, J., delivered the opinion of the court.

This is a suit brought by Bertram Gochrach and Frank L. Simkins against Albert L. Rubin and Rose M. Rubin to compel specific performance of an option to purchase land described in a lease of the land to the plaintiffs. By the contract and lease, dated December 28, 1939, Elias London leased to Bertram Gochrach two lots of land, with the privilege to lease an adjoining lot, situated in the city of Alexandria, Virginia, and used as a junk yard. The tenancy commenced January 10, 1940, and the original term of the lease was three years. At the beginning of the tenancy, Frank Simkins and Bertram Gochrach became partners. They took possession of the three lots and treated the lease as a partnership asset, trading under the name of Seaboard Salvage Company.

In the fall of 1942, Albert L. Rubin and Rose M. Rubin acquired a freehold in the leased premises, subject to the above lease.

The lease and contract agreement expressly stipulated:

"The said Gochrach covenants and agrees to pay for the privilege of said lease and all other lease rights herein contained, to said London, the sum of $500.00 cash and also to give him a note for $100.00 payable 30 days after the date hereof, and to pay each month during said three year period the sum of $40.00 per month on the 10th day of each month beginning on January 10, 1940."

In another provision, the lessee agreed to pay $15 additional per month for the use of a lot adjoining the lots first mentioned.

The agreement then contained the following additional provision:

"It is also mutually covenanted and agreed that said Gochrach shall have the privilege of renewing this lease

upon the two lots first mentioned for an additional further period of two years at the rental of $60.00 per month, and during the same time if he so desires he may continue the lease upon the third lot mentioned for same said period at $15.00 per month.

"It is mutually understood and agreed that said Gochrach shall have the option to purchase from said London at any time during this lease or any renewal thereof all three of said lots at the total price of $15,000.00 * * * ."

In October, 1942, Gochrach was inducted into the Naval service of the United States. Simkins continued the operation of the partnership business, as a junk business, on the leased premises until his entry into the Military service of the United States in January, 1943. The business was thereafter operated until October, 1943, on behalf of the partners by a man named Edward Tramwell.

In October, 1943, Sherman Pritzker was placed in charge of the operation of the business by Frank L. Simkins, who was on furlough from the Army at that particular time.

Thereafter, both Gochrach and Simkins, as members of the armed service, were absent from Alexandria. In 1944 and during 1945, until they were discharged from the service, neither was able to keep in direct touch or ready communication with Pritzker, nor he with them. Gochrach was on the high seas and Simkins, after going through a training camp, was in the Army in Europe. Pritzker paid the rent monthly from the funds of Gochrach and Simkins.

On August 31, 1945, Rubin sent a letter by registered mail to the Seaboard Salvage Company requesting the company to vacate the premises in thirty days. The letter was received by Pritzker. On September 1, 1945, Pritzker paid Rubin $75, covering rent to October 10, 1945.

Gochrach was discharged from the service on October 19, 1945, and Simkins on the following day. Both of them returned to Alexandria on October 20, 1945. They went directly to their place of business and finding a man named Morris Gordon apparently in charge of the premises, they

immediately called on Albert L. Rubin. They informed Rubin that they were ready and willing to buy the property. Rubin told them that their option had expired, and that he did not want to sell it. Simkins and Gochrach then consulted counsel, and tendered to Rubin payment of the rent to November 10, 1945. Rubin informed them that the rent had already been paid by Morris Gordon. The appellees then made a written offer to purchase the property and tendered the purchase price, subject to examination of its title. Rubin continued his refusal to sell.

On November 26, 1945, the appellees filed their bill for specific performance, relying on the Soldiers and Sailors Civil Relief Act of 1940, 50 U. S. C. A. Appx., section 501, *et seq.* The court sustained a demurrer to the bill, with right of the appellees to amend. The appellees filed an amended bill, relying, in addition, on a renewal of the tenancy and option by holding-over. A demurrer thereto was overruled. The appellants then answered.

The cause came on to be heard on the original and amended bills, the answer of the defendants, and upon the evidence taken in open court. The court held that the appellees were hold-over tenants for the term of a year, expiring January 10, 1946, under the terms and conditions of the original lease, and that, having complied during that period with the terms and conditions of the option to purchase contained in the original lease, they were entitled to specific performance. It accordingly decreed specific performance upon the payment of the sum of $15,000 by the appellees to the appellants.

The appellants contend that the court erred in decreeing specific performance because the option to purchase the property had expired at the time of the attempt to exercise it. In support of their assignment, they argue, first, that the subsequent tenancy was not a "hold-over," but a tenancy under a new agreement not mentioning any option; second, that the option was not operative during the subsequent tenancy even if it was a "hold-over" because the

operative period was restricted to the original or single renewal term, and was not implicit in a "hold-over" tenancy; and, third, that the option, if embraced in the "hold-over" was voluntarily surrendered and abandoned.

The facts which we have already stated are not in controversy. The additional evidence presents little conflict, save upon the questions whether the subsequent tenancy was a "hold-over" or tenancy under a new agreement, and, if a hold-over tenancy, whether it was voluntarily abandoned.

In reliance upon their contentions, the appellants insist that Pritzker was a partner with Gochrach and Simkins in the Seaboard Salvage Company. The evidence is wholly adverse to this contention. It discloses that Pritzker was merely employed to manage and conduct the salvage business of Gochrach and Simkins during their absence in the armed services of the United States. He had no power or authority to bind his employers to a lease, or surrender their rights as tenants of the property upon which the business was conducted.

The first term under the lease expired January 10, 1943. The second term for two years expired January 10, 1945. The renewal of the lease for the two-year period is evidenced only by the continued occupancy of the property by the appellees and their payment of the specific rent to their landlord, Rubin.

Pritzker testified that, perhaps, a week before January 10, 1945, he heard that the lease of his employers was about to expire; that he did not know anything about the lease or its terms; that he wrote to Simkins, who was then in Europe, about the matter and some weeks or months later he got a reply; that he conferred with Rubin about the purchase of the property, but was unable to raise the money; that during his discussions with Rubin, the latter told him that he could continue to occupy the premises until the end of the war on a month to month basis; and, without making any new agreement, he continued to pay the rent as theretofore.

When Pritzker received the notice of August 31, 1945, to vacate the premises in thirty days, he immediately went to a representative of the Red Cross for advice, consulted an attorney, and wrote to Simkins. He said he was very much confused, and did not know what to do; that he did not want his employers to lose what they had in their business; and that, doing what he thought was best for his employers, he arranged to sell the junk, but not the business, of the company, to Morris Gordon. The Seaboard Salvage Company did not vacate the premises; but he personally left, leaving the remaining property of his employers in charge of other employees of the company. The latter were paid by him out of the funds of the company. He knew that Morris Gordon had made some agreement with Rubin, the terms of which he did not know. Gordon, however, entered upon the premises during September.

Gochrach said that Pritzker was employed merely to take care of the business, which belonged to Simkins and himself, while they were in the armed services; that he understood that it was perfectly agreeable with Rubin for his company to occupy the premises and pay the rent until the partners came back from the service, and then they would negotiate a deal for its sale; and that two or three months after January 10, 1945, when he was on a ship, he heard that some question had been raised about the expiration of the lease, but he was unable to give it his attention then.

Rubin testified that immediately after he bought the property from London, he informed Simkins of its purchase; that he never saw Simkins afterwards; that while Simkins was in the armed services, Pritzker paid him the rent; that Pritzker expressed a desire to purchase the property but was unable to raise the money; and that he told Pritzker two or three days before the lease expired that when it expired he would rent the property from month to month, as he expected to go in business there himself.

When he rented the property to Gordon for the month beginning October 1, 1945, he thought the rent of the appellees was payable for a period running from the first to the last day of the month, instead of from the tenth of a month to the tenth day of the succeeding month. Rubin gave no notice after September 1, 1945, to the appelles to vacate, nor did he otherwise attempt to get in touch with them.

Morris Gordon said that he rented the property from Albert L. Rubin for the month of October, 1945, paying $75 rent; that, however, he went on the premises about the middle of September, 1945, and purchased the scrap and junk thereon from Pritzker; that subsequently he had some disagreement with Rubin, as to the time for removal of the purchased junk, and when Rubin tried to make him pay $300 a month for November and $750 for December; and that he then left his truck on the premises and closed the gates to the lots.

Pritzker had no knowledge of the terms of the lease. He did not undertake to bind his employers under any agreement, new or old. He acted in an emergency, according to his own judgment and the advice he got. There was little else that he could do. He held on to the premises to the last, and surrendered no right of his employers voluntarily.

■ ■ The finding of facts by the learned chancellor, who saw and heard the witnesses, is amply supported by the evidence. Under familiar principles, the finding of the trial court on conflicting evidence is binding. 1 Digest of Va. and W. Va. Reports, (Michie) Appeal and Error, section 329; 2 Va. and W. Va. Reports, (West) Appeal and Error, section 931; *Ashby* v. *Dumouchelle*, 185 Va. 724, 731, 40 S. E. (2d) 493.

■ "Where a landlord allows a tenant for a term of years to hold over after the expiration of his term, the one paying and the other receiving the rent formerly paid, without any new agreement, the tenant becomes a tenant from year to year." *Elliott* v. *Birrell*, 127 Va. 166, 170, 102 S. E. 762.

■ The law presumes the hold-over to be upon the terms

of the original lease, subject to the same rent and to the covenants of the original demise so far as these are applicable to the new tenancy. *Hobday* v. *Kane*, 114 Va. 398, 401, 76 S. E. 902; *Peirce* v. *Grice*, 92 Va. 763, 767, 24 S. E. 392; 6 Digest of Va. and W. Va. Reports, (Michie) Landlord and Tenant, section 7; 32 Am. Jur., Landlord and Tenant, section 948; 16 R. C. L., Landlord and Tenant, section 682.

The presumption may, however, be repelled by evidence showing that such holding over is in another character or for some other purpose than that of tenant from year to year. *Thompson* v. *Artrip*, 131 Va. 347, 108 S. E. 850.

The real question here is, whether the subsequent or hold-over tenancy of the appellees operated to extend the time for exercising the option to purchase contained in the original lease.

The courts are generally in agreement that where an original lease provides for an extension of the term at the tenant's election, an option therein contained to purchase during the term is likewise extended. Where the tenancy is continued by a subsequent agreement, the continuance of the option depends upon the construction to be placed upon the agreement. But where the subsequent tenancy is by holding over, and the option to purchase is not limited to the time of the term of the original lease, it is exercisable at any time during the continuance of the relation of the landlord and tenant, under the terms of the original lease. In other words, where time is not of the essence of the right to exercise such option, it may be exercised by the tenant holding over. Annotation 37 A. L. R. 1245. But where the option to purchase in the original lease is limited to a specific time, it cannot be exercised after the expiration of the option period. *Napper* v. *Rice*, 127 W. Va. 157, 32 S. E. (2d) 41; *Atlantic Product Co.* v. *Dunn*, 142 N. C. 471, 55 S. E. 299.

In *Newton* v. *White*, 115 Va. 844, 80 S. E. 561, the lease contained a covenant that the lessor would, at the termination of the lease, take over and pay the lessee for a certain

building the lessee was required to erect on the leased land. The lease was for a term of eleven years. At its expiration, the lessee was permitted to hold over from year to year for six years, without any new contract, express or implied, paying the same rent and discharging other obligations imposed by the original lease. It was held that the law presumed the hold-over to be upon the terms of the original lease, so far at least as they were applicable to the new condition of things, and thus carried with it a continuation of the lessor's promise to pay for the buildings at the termination of the relation of landlord and tenant.

Appellants cite several cases which are based on facts different from those in the present case.

In *Sherwood* v. *Tucker* (English Court of Appeal, 1924), 2 Ch. 440, 37 A. L. R. 1239, it was held that an endorsement by the landlord and tenant on a lease for three years "that this lease be extended for three years," did not operate to extend an option in the original lease which gave the tenant the right to purchase the demised premises "during the three years hereby provided for," such obligation being a collateral contract of the original lease and not embraced in the extension agreement. There was no provision in the original lease for an extension or renewal. There was no consideration for other rights and privileges in addition to the rent reserved for use and occupancy. The court based its conclusion on the fact that the lease expressly limited the option to the original three-year term, and upon its construction of the phrase, "this lease be extended for three years," as expressly limiting the extension agreement to a demise of the premises.

In *Thompson* v. *Artrip, supra,* the holding over was under a new agreement and the rights of the parties were determined with reference to the new contract.

In cases of the character under review, the facts are generally determinative of the issue. Thus, in the present case, the wording of the contract and lease necessarily plays a vital part in such determination. In that agreement, the lessee agreed "to pay for the privilege of said lease and all

other lease rights" therein contained the sum of $600, and a monthly rental of $40 for a term of three years.

The $600 payment was a part of the consideration for the whole agreement, the lease and the contract. In addition to the demise of the premises for three years, there were two additional rights or privileges granted the lessee. One of these was the right of renewal for an additional period of two years. The other was the right to purchase the demised premises "at any time during this lease or any renewal thereof."

The option to purchase was not restricted to its exercise during a single renewal period for two years; but was expressly extended to the period of "any renewal" of the lease. The words "any renewal" are comprehensive, and logically include more than one renewal. The meaning of the word "any" in the connection in which it was used seems to be clear and deliberate. The option thus was carried into "any renewal" of the original lease where the relation of landlord and tenant continued as theretofore. Since the option was not limited to the period of the original lease, nor to a single renewal, the time of its exercise was not of the essence of the contract.

We are not particularly interested in discussing whether a hold-over tenancy constitutes a renewal or extension of the original lease or a new tenancy. A hold-over tenancy upon the same terms and conditions as the original tenancy, though it be, in a sense, a new tenancy, carries with it the same obligations and privileges as are carried by a tenancy in renewal and extension of the terms of the original lease.

In the view which we take of this case, it is not necessary to consider the applicability of the Soldiers and Sailors Civil Relief Act of 1940, and its effect upon the parties. We, therefore, expressly refrain from expressing any opinion with reference thereto.

We are, for the reasons stated, of opinion to affirm the decree of the trial court.

*Affirmed.*