# Richmond

## JACK R. WILKINS, WHO SUES, ETC. v. LEVIN NOCK DAVIS, SECRETARY, ETC., ET AL.

January 18, 1965.

Record No. 5919.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, l'Anson and Carrico, JJ.

*Henry E. Howell, Jr.* and *H. Lee Kanter, (Howell, Anninos & Daugherty; Kanter, Kanter & Sachs,* on brief), for the petitioners.

*David J. Mays* and *R. D. McIlwaine, Assistant Attorney General (Robert Y. Button, Attorney General; Henry T. Wickham; Tucker, Mays, Moore & Reed,* on brief), for the respondents.

BUCHANAN, J., delivered the opinion of the court.

A petition for a writ of mandamus was filed in this court, Va. Const. § 88, on April 10, 1964, against the secretary and members of the State Board of Elections by the petitioner, Jack R. Wilkins, who alleged that he is a citizen of the Commonwealth, a duly qualified voter and taxpayer, and sues on behalf of himself and all other citizens of the Commonwealth similarly situated. He alleged that § 24-3 of the Code of Virginia, 1950, which apportioned the Commonwealth into congressional districts, failed to comply with § 55 of the Constitution of Virginia, violated rights guaranteed to him by the Constitution and laws of the United States, and was a nullity, in that said congressional districts do not contain as nearly as practicable an equal number of inhabitants.

Specifically petitioner alleged that each of the ten congressional districts of Virginia, according to the 1960 census, should contain a population of approximately 396,694, whereas in the Second District there are 494,292 inhabitants, and in the Tenth District 539,618, and in the Seventh District only 312,890.

Petitioner prayed that defendants, State Board of Elections, be commanded to certify to all the electoral boards in the State only candidates at large for Congress, and to instruct said boards to print on the ballots only the names of candidates for Congress who offered as candidates at large in the primary elections to be held on July 14, 1964, and at the general election to be held on November 3, 1964, unless the Governor should in the meantime call a special session of the General Assembly of Virginia and said Assembly should enact a valid and legal congressional redistricting law.

Later, on June 16, 1964, on petitioner's motion, he was allowed to amend the prayer of his petition to ask that in the event the relief he prayed for was not granted in time to affect the November 3, 1964, election of congressmen, then that the State Board of Elections

be commanded to take such actions as necessary to conduct only elections at large for congressmen until the General Assembly should enact a legal reapportionment act for the congressional districts.

Section 24-3 of the Code is the Redistricting Act of 1952, as amended by Acts 1958, ch. 333, and by Acts 1964, ch. 536, and divided the State into ten congressional districts. While the petitioner alleges that the said Redistricting Act is a nullity, and affords no authority for electing ten congressmen from the ten districts as now constituted, his counsel stated, in objecting to some evidence offered by the defendants, that his complaint is directed to the Second and Fourth Congressional Districts as now constituted; and that it was immaterial to examine other districts since by merely taking the City of Chesapeake from the Second District and giving it to the Fourth, "we will have met the test of contiguity, compactness and population distribution between those districts."

In his brief petitioner states that there are two principal questions raised by his petition, the first of which is: "Do the disparities in population existing in the ten Congressional Districts of Virginia as constituted by the Redistricting Act of 1952, violate the requirements of Section 55 of the Constitution of Virginia?" The section provides:

"The General Assembly shall by law apportion the State into districts, corresponding with the number of representatives to which it may be entitled in the House of Representatives of the Congress of the United States; which districts shall be composed of contiguous and compact territory containing as nearly as practicable, an equal number of inhabitants."

The requirements of § 55 were considered by this court in *Brown v. Saunders*, 159 Va. 28, 166 S.E. 105, in which the constitutional validity of the Virginia Apportionment Act of 1932 was assailed. The census of 1930, said the court, showed Virginia to have a population of 2,421,829, entitling her to nine congressmen. An equal division of population among the districts would give each a population of 269,092. Under the 1932 apportionment the First District had a population of 239,835; the Second 302,715, the Third 288,939; the Fourth 212,952; the Fifth 251,090; the Sixth 280,708; the Seventh 336,654; the Eighth 183,934, and the Ninth 325,024. We said in that case:

"* * It is inevitable that there must be in the several districts some variation from the unit of representation found by dividing the total population of the State by the number of representatives apportioned to the State. These variations will necessarily be augmented where,

as in Virginia, it has been the unbroken custom to refrain from dividing any county or city into separate districts. From the early history of Virginia, even in Colonial days, the community of interests in the respective counties has been recognized, and in no division of the State for any governmental purpose has any county line been broken. * * ." 159 Va. at 37, 166 S.E. at 107-8.

And further it was said:

"Mathematical exactness, either in compactness of territory or in equality of population, cannot be attained, nor was it contemplated in the provisions of section 55. * * No small or trivial deviation from equality of population would justify or warrant an application to a court for redress. It must be a grave, palpable and unreasonable deviation from the principles fixed by the Constitution. No exact dividing line can be drawn." 159 Va. at 43-4, 166 S.E. at 110-11.

Applying the principles stated to the facts shown, the court concluded: "The inequality is obvious, indisputable and excessive." It pointed out that the disparity between the Seventh (the largest district) and the Eighth (the smallest) was 152,720, and between the Eighth and Ninth the difference was 140,890, and between the Second and Fourth was 89,736. "Tried by the test of equality of representation prescribed by the Constitution, the result obtained by the act appears arbitrary." 159 Va. at 46, 166 S.E. at 111.

By the 1960 census, as corrected, it was ascertained that on April 1, 1960, Virginia had a population of 3,954,429. If equally divided among the ten congressional districts of the State, each would have a population of 395,442. The then population of each district, as shown by the corrected census report, was as follows:

| | |
|---|---|
| First District | 422,624 |
| Second District | 494,292 |
| Third District | 418,081 |
| Fourth District | 352,157 |
| Fifth District | 325,989 |
| Sixth District | 378,864 |
| Seventh District | 312,890 |
| Eighth District | 357,461 |
| Ninth District | 364,973 |
| Tenth District | 527,098 |

As will be observed, the smallest district in population is the Seventh, with 312,890. The largest is the Tenth, with 527,098, and

the next largest is the Second, with 494,292. Thus the Tenth exceeds the Seventh by 214,208 and the Second exceeds the Seventh by 181,402.

It also appears that the population of the Second District exceeds the theoretical average by 98,850, and the Tenth exceeds it by 131,-656, while the Fourth is 43,285 less than the average, the Fifth is 69,453 less and the Seventh 82,552 less.

Following the 1960 census report the Governor appointed a commission, known as the Hoover Commission, after its chairman, to report with recommendations concerning the apportionment of representation in the General Assembly and in Congress. At the completion of this study the Commission reported that "The present apportionment [Act of 1952] of the House of Representatives of the Congress should remain as it is." Among the reasons given for so reporting were these:

(1) The population of the Tenth and Second Districts were substantially greater than the average, but the only feasible way to change the Tenth would be to split Fairfax county, which had never been done, or put the city of Alexandria into the Eighth District, which would result in a geographically divided, non-contiguous district, impairing the elements of community interest, compactness and contiguity.

(2) The Second District, composed of the City of South Norfolk and Norfolk county [now composing the city of Chesapeake], and the cities of Norfolk and Portsmouth, represent nearly the ideal in community of interest, compactness, contiguity and other factors, exclusive of population, to be considered in a reapportionment.

(3) To bring the districts to approximately equal population would involve changes of doubtful practicality, the dissolution of districts which have the greatest community of interest, and mean a radical restructuring of the State.

The report referred to *Brown* v. *Saunders, supra,* as being the controlling case in Virginia on the reapportionment of congressional districts.

The defendants contend that while the principles laid down in the *Brown* case are applicable here, and to that extent control the decision to be rendered, the application of those principles to the facts and circumstances of this case compel a different result. They point out that a demurrer to the petition was filed in the *Brown* case, thus admitting the facts concerning population and no other facts were

before the court, while the present case contains the testimony of population experts, the report of the Hoover Commission, and the testimony of three congressmen and four citizens concerning compactness, natural boundaries and community of interest of four congressional districts [Second, Fourth, Eighth, Tenth]. These matters are urged as distinguishing elements of the present case.

Under § 55 of the Virginia Constitution congressional districts must be composed of "contiguous and compact territory containing as nearly as practicable, an equal number of inhabitants." There is a distinction, it is argued, between "inhabitants" and "population," the former referring to those who dwell permanently in a place as distinguished from transient lodgers or visitors (Webster's Third New Int. Dict., p. 1163). By reason of this distinction, it is further contended, the military population of Virginia are not "inhabitants" of Virginia and may properly be excluded in determining the number of inhabitants of the congressional districts.

There was evidence that in 1960 there were in Virginia 335,510 military-related persons, of whom 128,376 were in the Second District and 93,894 in the Tenth District. If these military-related persons be excluded from the census population of the State, and from the Second and Tenth Districts, the number of the inhabitants of the Tenth would be some 66,000 in excess of a State average, and the inhabitants of the Second would be only some 4,000 in excess of such average.

There was also evidence that only a small number of the persons in the military services registered to vote in the Second and Tenth Districts, and that there was a much higher degree of mobility in areas of the Second and Tenth than in the other parts of the State.

We are not convinced that the military personnel constitute a permissible exclusion. There was evidence that the military-related personnel were included in ascertaining that Virginia's population entitled her to ten congressmen. It is noted too that in the Virginia edition of the 1960 census report it is stated:

"This report presents statistics on the number of inhabitants of the State and its counties or comparable areas. * *."

"The extent of presentation of separate statistics for individual States is related, in part, to the Constitutional requirement that census figures serve as the basis for Congressional apportionment. [Art. I, § 2] * *."

Such attempted exclusion met with the disapproval of the Supreme

Court in *Davis* v. *Mann*, 377 U.S. 678, 84 S.Ct. 1453, 12 L.ed.2d 609, in which that court declared the 1962 apportionment of seats in the Virginia General Assembly to be invalid under the Equal Protection Clause of the Fourteenth Amendment. The court said:

"We reject appellants' argument that the under-representation of Arlington, Fairfax and Norfolk is constitutionally justifiable since it allegedly resulted in part from the fact that those areas contain large numbers of military and military-related personnel. Discrimination against a class of individuals, merely because of the nature of their employment, without more being shown, is constitutionally impermissible. Additionally, no showing was made that the Virginia Legislature in fact took such a factor into account in allocating legislative representation. * *."

In addition to the requirement that congressional districts must be contiguous and compact, § 55 of the Constitution also commands that they contain, *as nearly as practicable*, an equal number of inhabitants. *Brown* v. *Saunders* spoke the obvious in saying that some variation in numbers is inevitable. That case also said that community of interest in the respective counties has been recognized and it has been the unbroken custom to avoid dividing a county or city into separate districts. At the same time the court repeated the statement of the Illinois court in *Moran* v. *Bowley*, 347 Ill. 148, 179 N.E. 526, 532, that " 'Any plan of districting which is not based upon approximate equality of inhabitants will work inequality in right of suffrage and of power in elections of the representatives in Congress.' " 159 Va. at 38, 166 S.E. at 108. And this also was said in *Brown* v. *Saunders:*

"Hence, for a period of more than 102 years, the principle of practical equality of representation in the House of Representatives in Congress has been the fundamental law of Virginia, and during all of that time this principle has been recognized generally in forming the congressional districts in the State, * *." 159 Va. at 43, 166 S.E. at 110.

Testing the 1932 Apportionment Act by these principles, the court found that the differences of 152,720 between the populations of the Seventh and Eighth Districts, and 140,890 between the Eighth and the Ninth, and 89,736 between the Second and Fourth were excessive and required the conclusion that the 1932 Act was invalid.

In the present case the difference between the populations of the Seventh and the Tenth Districts is 214,208; between the Second and the Seventh is 181,402 and between the First and Seventh 109,734.

The evidence shows a greater community of interest among the people of the Tenth District, which is a part of metropolitan Washington, than between the people of that district and those of the adjoining Eighth. The Tenth District is the second smallest in area of the ten districts, containing only 446 square miles, and the interests of its people are primarily centered in Washington. The only district contiguous to the Tenth is the Eighth, which is the second largest district in area, covering 7,170 square miles, containing twenty counties and two cities, and the interests of its people are largely agricultural.

The evidence also shows that the Fourth District, to which the petitioner wants the city of Chesapeake transferred from the Second District, is already the largest in area in the State, having 7,364 square miles and containing eighteen counties and four cities. The Second is now the smallest of the ten districts in area, containing 412 square miles. There is some controversy in the evidence as to the degree of community of interest between Chesapeake and the eastern part of the Fourth District.

These are some of the problems of redistricting. There is no denying that these and other problems exist and from the standpoint of community of interest alone this record would show little reason for disturbing the boundaries of the present districts.

But community of interest is not the only requirement, or even one of the requirements spelled out in the Constitution. There must be, as nearly as practicable, an equal number of inhabitants in the districts. Very clearly there is not an equal number, or even approximately an equal number, in some of the districts, and in at least two of them, the Second and the Tenth, there is a very large inequality, and this record does not demonstrate that this substantial difference comes as close to equality as practicable. Nor does the record show that the boundaries of these two districts, or of other districts, cannot be so arranged as to make districts that are contiguous and compact and at the same time contain as nearly as practicable an equal number of inhabitants. Such is the command of § 55 of the Virginia Constitution and since the Apportionment Act of 1952 does not now meet that requirement, it is invalid.

It is clear also, even more so, that the said apportionment is invalid under the Federal Constitution as recently construed by the Federal Supreme Court, which is the second point relied on by the petitioner.

In *Wesberry* v. *Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.ed.2d 481 (1964), involving the validity of the 1931 Congressional Districting Act of Georgia, the court decided that that Act "grossly discriminates against voters in the Fifth Congressional District. A single Congressman represents from two to three times as many Fifth District voters as are represented by each of the Congressmen from the other Georgia congressional districts. The apportionment statute thus contracts the value of some votes and expands that of others. * *."

The Fifth Georgia District, said the court, had a population, according to the 1960 census, of 823,680 and the Ninth only 272,154, while the average of the ten districts of the State would be 394,312. It is true that the variance in the Fifth Georgia District was greater than that in the present Second and Tenth Virginia Districts, but the court said:

"We hold that, construed in its historical context, the command of Art. I, § 2, that Representatives be chosen 'by the People of the several States' means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's. * * The history of the Constitution, particularly that part of it relating to the adoption of Art. I, § 2, reveals that those who framed the Constitution meant that, no matter what the mechanics of an election, whether statewide or by districts, it was population which was to be the basis of the House of Representatives."

The opinion concluded with this statement:

"While it may not be possible to draw congressional districts with mathematical precision, that is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives. That is the high standard of justice and common sense which the Founders set for us."

In *Baker* v. *Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.ed.2d 663 (1962), the complainants alleged that by means of a 1901 statute of Tennessee apportioning the members of the State's General Assembly, they had been denied the equal protection of the laws guaranteed to them by the Fourteenth Amendment. The Supreme Court, reversing the decision of a three-judge District court, held that the allegation of equal protection presented a justiciable constitutional cause of action "within the reach of judicial protection under the Fourteenth Amendment."

There were strong, albeit unavailing, dissents by Justices Frank-

furter and Harlan. The former protested that the decision "reverses a uniform course of decision established by a dozen cases, including one by which the very claim now sustained was unanimously rejected only five years ago." The latter wrote that Justice Frankfurter's dissenting opinion, in which he joined, "demonstrates the abrupt departure the majority makes from judicial history by putting the federal courts into this area of state concerns * *."

*Reynolds* v. *Sims*, decided June 15, 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L.ed.2d 506, dealt with the validity under the Equal Protection Clause of the Fourteenth Amendment of the existing and proposed plans for the apportionment of seats in the two Houses of the Alabama legislature. The court said that its problem was to ascertain "whether there are any constitutionally cognizable principles which would justify departures from the basic standard of equality among voters in the apportionment of seats in state legislatures."

After stating that the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of State legislators, the court said:

"We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. * * Since, under neither the existing apportionment provisions nor under either of the proposed plans was either of the houses of the Alabama Legislature apportioned on a population basis, the District Court correctly held that all three of these schemes were constitutionally invalid. * *."

The court observed that while in *Wesberry* v. *Sanders, supra,* it had stated that "congressional representation must be based on population as nearly as is practicable," yet some distinction might well be made between congressional and state legislative representation; and "Somewhat more flexibility may therefore be constitutionally permissible with respect to state legislative apportionment than in congressional districting."

Yet having said so, the court emphasized its position that "Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." The court added that not history alone or economic or other group interests, or area alone, provide sufficient justification for deviation from the population principle; and that "With respect to the operation of the Equal Protection Clause, it

makes no difference whether a State's apportionment scheme is embodied in its constitution or in statutory provisions."

On the same day, June 15, 1964, the Supreme Court decided five additional cases, holding that the constitution or statutes, or both, of the States of New York, Maryland, Virginia, Delaware and Colorado did not apportion representation in their respective State legislatures sufficiently or substantially on a population basis and hence violated the Equal Protection Clause of the Fourteenth Amendment.* And this in spite of the protest of Justice Stewart, joined by Justice Clark, that "there is nothing in all the history of this Court's decisions which supports this constitutional rule." (*WMCA, Inc.* v. *Lomenzo, supra*)

We said in *Brown* v. *Saunders:* "The unit of representation in such cases [legislative apportionment] would be less than when applied to the unit of representation in congressional districts, but the validity of such acts should be tested by the same principles of law." 159 Va. at 38, 166 S.E. at 108.

The validity of the Apportionment Act of 1952, as amended, cannot be upheld under the provisions of the Federal Constitution as construed and applied in the cited Federal cases.

However, as we said in *Brown* v. *Saunders*, "it is not the duty of the court to substitute its judgment for that of the legislature, but simply to declare what the law is, and to state whether or not the act is in conflict with the constitutional requirement." 159 Va. at 46, 166 S.E. at 111.

It is the duty of the General Assembly of Virginia to reapportion the congressional districts of Virginia so that each district shall be composed of contiguous and compact territory, containing as nearly as practicable an equal number of inhabitants, and, so far as can be done without impairing the essential requirement of substantial equality in the number of inhabitants among the districts, give effect to the community of interest within the districts.

Until such reapportionment is made, only elections at large for members of Congress from Virginia may be hereafter held.

The writ of mandamus will therefore issue directing and requiring the members of the State Board of Elections, and their successors in

---

* See *WMCA, Inc.* v. *Lomenzo*, 377 U.S. 633, 84 S.Ct. 1418, 12 L.ed.2d 568; *Maryland Committee for Fair Representation* v. *Tawes*, 377 U.S. 656, 84 S.Ct. 1442, 12 L.ed.2d 595; *Davis* v. *Mann*, supra; *Roman* v. *Sincock*, 377 U.S. 695, 84 S.Ct. 1462, 12 L.ed.2d 620; *Lucas* v. *Forty-Fourth General Assembly of State of Colo.*, 377 U.S. 713, 84 S.Ct. 1472, 12 L.ed.2d 632.

office, to take such action as may be necessary to conduct only elections at large in all future elections for members or a member of Congress from Virginia until the General Assembly of Virginia shall enact a constitutionally valid reapportionment act establishing the congressional districts of Virginia.

*Writ awarded.*