## CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

Keith O. Woodard
and Elaine A. Woodard

v.

George Wiltshire

September 27, 1990

Case No. (Law) 3890

By JUDGE JAY T. SWETT

This matter was tried without a jury September 13, 1990. Based upon the evidence taken during trial, the court makes the following factual findings.

Plaintiffs, Keith O. and Elaine A. Woodard (hereinafter "Woodard") entered into a two-year lease with defendant George Wiltshire (hereinafter "Wiltshire"). The lease was for Suite 1 at the Exchange Center on the Mall in Charlottesville. The lease ran from November 1, 1985, to October 31, 1987. Wiltshire leased the premises to operate a retail store known as "The Pewter Corner." The lease was to terminate October 31, 1987, unless Wiltshire requested in writing, no later than 120 days prior to October 31, 1987, that the lease be renewed for an additional three-year term. Under the renewal provision, the rent would increase each year for the three-year renewal term.

In May of 1987, Woodard and Wiltshire discussed whether Wiltshire would renew the lease beyond October 31, 1987. Wiltshire expressed concern that the rent was too high and asked Woodard for a reduction. While Woodard and Wiltshire differ on their recollection of whether Woodard agreed to reduce the rent if Wiltshire renewed, they did not agree on a new lease during the meeting. Woodard prepared a new lease proposal and provided it to Wiltshire.

The proposal was for a renewal of two years with rent at $1,250.00 per month. Under the old lease, Wiltshire was paying $1,200.00 per month. If Wiltshire renewed the old lease, he would pay $1,280.00 per month the first year, $1,344.00 per month the second year, and $1,411.20 per month the third year.

After Woodard sent Wiltshire the proposal for a two-year lease, there were few, if any, substantive discussions between them about the new lease agreement. On July 22, 1987, Wiltshire wrote to Woodard asking Woodard to explore the local rent market. Wiltshire wrote that if they were unable to reach an agreement, that Wiltshire wished to stay through Christmas. He proposed he remain as a month-to-month tenant beginning on November 1, 1987. Woodard does not recall receiving the letter.

In August Woodard met with an employee of Wiltshire to discuss the lease renewal. As of that meeting, Wiltshire had not given the required written notice under the renewal clause of the old lease. Other than return a copy of Woodard's two-year proposal with changes proposed by Wiltshire, nothing was accomplished during the August meeting.

On October 27, 1987, four days before the lease was to expire, Woodard and Wiltshire spoke about Wiltshire remaining as a tenant. Woodard testified that Wiltshire continued to object to the $1,250.00 per month demanded by Woodard. Wiltshire again suggested he stay on as a month-to-month tenant while they continued to negotiate. Woodard testified that he turned Wiltshire down. Wiltshire testified that Woodard said Wiltshire could stay on as a tenant from month-to-month while they continued to negotiate.

Two days later, on October 29, Woodard wrote Wiltshire enclosing another proposal for a new lease. He told Wiltshire that if the proposed lease was not executed and Wiltshire held over after November 1, 1987, that Woodard would consider Wiltshire as having elected to renew the lease for a three-year term under the provisions of the old lease.

Wiltshire responded by letter of November 3. He rejected Woodard's proposal and submitted a counter proposal. He paid $1,200.00 rent for November. Woodard responded on November 6, 1987, with a notice of default and notice to vacate on the grounds that Wiltshire had not paid

$1,280.00 in rent which Woodard claimed was called for under the renewal provision of the original written lease agreement. Wiltshire responded to the notice to quit by telling Woodard that he intended to stay month-to-month until evicted. Woodard took no action to evict him.

On December 1, 1987, Woodard wrote Wiltshire advising him again that he was in default. Wiltshire wrote back on December 5 and disputed Wiltshire's claim of the rent due and confirmed that he was occupying the space on a month-to-month basis. Wiltshire paid $1,200.00 for December rent. The check was returned by Woodard on the basis that the rent was $1,280.00 per month. In January, 1988, Wiltshire paid Woodard $100.00 for January rent taking the position that the balance of his security deposit, $1,100.00, would cover the balance of the rent due for January. Wiltshire vacated effective January 31, 1988, pursuant to written notice that he had given on December 18, 1987.

Based upon this evidence, the issue is whether there exists a three-year lease, a month-to-month lease, or a year-to-year lease. Woodard contends that by holding over after receipt of Woodard's October 29, 1987, letter, Wiltshire elected to accept Woodard's offer to renew for a three-year term, under the provisions of the 1985-1987 lease. Woodard argues in the alternative that if there is no three-year lease, then Wiltshire's act of holding over creates a lease from year-to-year and Wiltshire is liable for unpaid rent and other damages through October 31, 1988. Wiltshire argues that he and Woodard agreed that Wiltshire would lease the premises on a month-to-month basis after November 1, 1987, and that Woodard is entitled to nothing.

In Virginia, the general rule is that a tenant who holds over under a lease for a term of years following the expiration of the term becomes a tenant from year to year. *Rubin v. Gochrach*, 186 Va. 786, 794 (1947); *Elliott v. Birrell*, 127 Va. 166, 170 (1920). On the other hand, where there is a lease for a term of years which contains a right for the tenant to renew for an additional term of years at an increased rent, then a tenant who holds over and pays the increased rent will be deemed to have agreed to the terms of the extension of the original lease. *Crowder v. Virginia Bank*, 127 Va. 299, 302-303 (1920).

Here, Wiltshire did not invoke his right to renew his lease for a three-year term effective October 1, 1987. On the contrary, the evidence is clear that Wiltshire did not wish to exercise his right to renew and wished to continue occupying the premises only if he could obtain an agreement to do so at a reduced rent. Under the express terms of the lease agreement, the lease would "automatically terminate at the expiration of the term" unless the lessee invoked his right to renew in writing. Since Wiltshire did not invoke his right to renew, the lease terminated on October 31, 1987, by its own terms. Accordingly, *Crowder, supra,* does not apply. In *Crowder,* the tenant had a two-year lease with the right to extend for two years. At the expiration of the first two-year term, the tenant held over without saying anything to the landlord and continued to pay rent for nine months at the increased rate. The tenant then gave a notice to vacate in three months arguing that his tenancy was a hold-over from year to year. The Court rejected this argument finding that the tenant had exercised his privilege to renew and that the only basis under which he could renew was for the two-year term. Here, the evidence is clear that Wiltshire did not act in any way consistent with his desire to extend the original lease for the three-year renewal term.

Wiltshire did hold over by remaining in the space after November 1, 1987. Wiltshire argues that he did so under an agreement with Woodard that he would occupy the premises on a month-to-month basis. Where a tenant holds over under a lease for a term of years, there is a presumption that the hold-over term is from year to year and that the terms of the lease are the terms of the original lease, including rent and the various covenants. *Rubin, supra,* 186 Va. at 794-795. Wiltshire seeks to overcome that presumption by stating that he and Woodard agreed that his continued occupancy would be on a month-to-month basis. However, the court does not agree that Wiltshire has met his burden to prove a month-to-month tenancy after November 1, 1987. While Wiltshire testified that at some point Woodard verbally agreed to the month-to-month tenancy, the written evidence does not support and is indeed contrary to this position. Mr. Wiltshire proposed remaining in the premises as a month-to-month tenant in a July 22 letter to Mr. Woodard. There is no evidence to corroborate Mr.

Wiltshire's testimony that Mr. Woodard ever accepted this proposal. In fact, Mr. Woodard's actions indicate that he did not accept Wiltshire's proposal for a month-to-month lease. On October 27, and again on October 29, Woodard's proposals included either a two-year or a three-year lease. Wiltshire's November 3 letter in response does not mention a month-to-month lease. Wiltshire did not mention a month-to-month lease until December 5 in a letter to Woodard. Had Wiltshire seriously believed that he had a month-to-month lease effective November 1, 1987, then it is likely that he would have asserted the existence of that lease well before December 5.

Finally, Wiltshire argues that he should not be considered a hold-over tenant for a year's lease because he was misled by Woodard and that he did not expect to have to vacate on October 31, 1987, since they were continuing their negotiations and that he had no notice he would have to leave until October 29, 1987. He argues that this did not give him enough time because it took him weeks to be able to move his retail store once he found other space and that this was particularly difficult with Christmas approaching.

Wiltshire's argument calls into play Virginia Code Section 55-223. That statute provides that one who fails to vacate on the expiration of a lease does not become a tenant for another term when his failure to vacate is not willful, negligent, or for an avoidable cause. There is no case law which helps this court apply this statute. However, based on this evidence, I find that Wiltshire made a deliberate business decision to remain on while he continued to negotiate with Woodard. He did so at the risk that they would not reach an agreement. On this basis, I do not find that § 55-223 helps Wiltshire and it does not apply.

Accordingly, the court finds that Wiltshire held over following a lease for a term of years and became a tenant from year to year. Under *Rubin, supra*, the terms of that one-year lease would be at the same rent and at the same covenants as the original lease. Therefore, Wiltshire was obligated to pay Woodard $1,200.00 per month rent beginning November 1, 1987, through October 31, 1988. Since the covenants of the original lease would continue for the one-year term, Wiltshire is liable for late fees

and legal fees in accordance with the covenants of the original lease. Wiltshire is responsible for reasonable expenses of reletting the premises and for maintaining electricity during 1988 while the premises were vacant. Deducted from these amounts will be all credits and payments by Wiltshire, including his security deposit as well as all rent received by Woodard through October 31, 1988.

The Court understands that plaintiff's Exhibit 14 sets forth a calculation of the total damages to be awarded in favor of the plaintiffs and against the defendant and that this amount is $19,674.19.

Accordingly, judgment will be rendered in favor of the plaintiffs against the defendant in the sum of $19,674.19, with interest accruing from this date.