# W.E. Jamerson, et al.

## v.

# Pamela M. Womack, et al.

Record No. 920460

November 6, 1992

Present: All the Justices

# 508

Frank M. Slayton (J. William Watson, Jr.; James W. Hopper; Vaughan & Slayton; Edmunds & Watson; Parvin, Wilson, Barnett & Hopper, on brief), for appellants.

*Gregory E. Lucyk, Senior Assistant Attorney General (Mary Sue Terry, Attorney General; Stephen D. Rosenthal, Chief Deputy Attorney General; Gail Starling Marshall, Deputy Attorney General, on brief), for appellees.*

JUSTICE WHITING delivered the opinion of the Court.

In this suit, we decide whether the chancellor erred in holding that the General Assembly's 1991 reapportionment act (the 1991 plan) did not violate the compactness requirements of Article II, § 6 of the Constitution of Virginia in fixing the boundary lines of two of the forty senatorial districts.[1]

---

[1] As pertinent, Article II, § 6 provides:

Members . . . of the Senate and of the House of Delegates of the General Assembly shall be elected from electoral districts established by the General Assembly. *Every electoral district shall be composed of contiguous and compact territory* and shall be so constituted as to give, as nearly as is practicable, representation in proportion to the population of the district. The General Assembly shall reapportion the Commonwealth into electoral districts in accordance with this section in the year 1971 and every ten years thereafter.

Any such reapportionment shall take effect immediately and not be subject to the limitations contained in Article IV, Section 13, of this Constitution.

(Emphasis added.)

W.E. Jamerson and 33 other residents, taxpayers, and "duly qualified" voters in the 15th and 18th Senatorial Electoral Districts (the complainants) brought this declaratory judgment suit against Pamela M. Womack, Secretary of the Commonwealth, and other state officials (the defendants). The complainants contend that the boundaries of Senatorial Districts 15 and 18 do not comply with the compactness requirement of Article II, § 6. These boundaries were fixed by Code §§ 24.1-17.19 and -17.22, as enacted in Chapter 18 of the Acts of the 1991 Special Session of the General Assembly.

Both districts are in Southside Virginia. District 15 extends approximately 145 miles from west to east and encompasses all of Appomattox, Charlotte, Prince Edward, Lunenburg, Nottoway, and Sussex Counties, parts of Dinwiddie, Greensville, Isle of Wight, Mecklenburg, Prince George, and Southampton Counties, and parts of the Cities of Emporia, Franklin, and Suffolk. Code § 24.1-17.19. District 18 extends approximately 165 miles from west to east and includes all of Halifax and Brunswick Counties and the City of South Boston, parts of Greensville, Isle of Wight, Mecklenburg, and Southampton Counties, and parts of the Cities of Chesapeake, Emporia, Franklin, Portsmouth, and Suffolk. Code § 24.1-17.22. A map showing the perimeters of these districts and those parts of the jurisdictions included therein is attached as an exhibit.

Following a two-day evidentiary hearing, the chancellor held that the reapportionment of these senatorial districts did not violate Article II, § 6. Accordingly, he denied the petition for declaratory judgment and dismissed the case. The complainants appeal.

Several well-settled principles apply to a review of legislative determinations. Legislative determinations of fact upon which the constitutionality of a statute may depend bind the courts unless clearly erroneous, arbitrary, or wholly unwarranted. *Bristol Redevelopment & Hous. Auth. v. Denton*, 198 Va. 171, 176, 93 S.E.2d 288, 292 (1956) (whether area is blighted within meaning of Virginia Housing Authorities Act). However, "legislative conclusions based on findings of fact are not immune from judicial review where they are arbitrary and unwarranted." *Id.* at 176-77, 93 S.E.2d at 292.

As a corollary, it is also settled that if the validity of such a determination is fairly debatable, the legislative determination will be upheld by the courts. *Barrick v. Board of Supervisors*, 239 Va. 628, 630, 391 S.E.2d 318, 319 (1990) (adoption of zoning ordinance). In this context, an issue is "fairly debatable" if, "when,

measured by both quantitative and qualitative tests, the evidence offered in support of the opposing views would lead objective and reasonable persons to reach different conclusions." *Board of Supervisors v. Jackson*, 221 Va. 328, 333, 269 S.E.2d 381, 384-85 (1980) (denial of rezoning by board of supervisors).

■ Further, we also note the "strong presumption of validity" attached to every statute and the requirement that it "clearly" violate some constitutional provision before courts will invalidate it. *Caldwell v. Seaboard System R.R.*, 238 Va. 148, 152, 380 S.E.2d 910, 912 (1989). Thus, courts "have nothing to do with the question whether or not legislation is wise and proper"; only where the statute in issue is "plainly repugnant" to a constitutional provision will we declare it null and void. *City of Charlottesville v. DeHaan*, 228 Va. 578, 583-84, 323 S.E.2d 131, 133 (1984) (quoting *Ex parte Settle*, 114 Va. 715, 719, 77 S.E. 496, 497 (1913)).

■ In this particular litigation, it should be remembered that reapportionment "is, in a sense, political, and necessarily wide discretion is given to the legislative body." *Brown v. Saunders*, 159 Va. 28, 36, 166 S.E. 105, 107 (1932). An abuse of that discretion is shown only by a "grave, palpable and unreasonable deviation from the principles fixed by the Constitution." *Id.* at 44, 166 S.E. at 110-11. In considering the validity of one provision of a reapportionment statute, we said that "[w]hen fair minded men from an examination of the apportionment and division can entertain no reasonable doubt that there is a grave, unnecessary, and unreasonable inequality between districts, the Constitution has been violated and it is the duty of the court to so declare." *Id.* at 45, 166 S.E. at 111 (quoting *Attorney General v. Suffolk County Apportionment Comm'rs*, 224 Mass. 598, 607, 113 N.E. 581, 586 (1916)).

■ In addition to the constraints imposed upon courts in their review of legislative determinations of fact, we also note that, as an appellate court, we are bound by a chancellor's resolution of disputed facts, if supported by credible evidence. *Rubin v. Gochrach*, 186 Va. 786, 794, 44 S.E.2d 1, 4 (1947). And we also consider the evidence and all reasonable inferences that can be drawn therefrom in the light most favorable to the parties who prevailed before the chancellor. *Carter v. Carter*, 223 Va. 505, 509, 291 S.E.2d 218, 220 (1982).

■ Finally, we recognize two overarching conditions that bind state legislatures in reapportioning electoral districts. The first condition is that imposed by Article I, § 2 of the United States Constitution. It compels "equal representation for equal numbers of people"; otherwise expressed, "one person, one vote." *Wesberry v. Sanders*, 376 U.S. 1, 18 (1964). The second condition is compliance with those mandates of the Federal Voting Rights Act, 42 U.S.C. §§ 1971-73bb, that bind state legislatures in their reapportionment acts because of the provisions of the Supremacy Clause of the United States Constitution, Article VI, and of the Fourteenth Amendment to that Constitution. *See Katzenbach v. Morgan*, 384 U.S. 641, 643-47 (1966).

■ One such mandate is that there be no dilution of minority group voting strength in a reapportionment. 42 U.S.C. § 1973(b); *see Thornburg v. Gingles*, 478 U.S. 30, 44 (1986). In order to assure compliance with this mandate, the Voting Rights Act also requires prior approval of a state's reapportionment plans, either by a three-judge District Court for the District of Columbia or by the Attorney General of the United States. 42 U.S.C. § 1973c.

With these principles in mind, we turn to the relevant evidence in this case. First, we consider the legislative action leading up to the adoption of the statute in question.

■ The official United States census redistricting data, received by the General Assembly on January 22, 1991, indicated that significant population shifts had occurred in Virginia since the 1980 census. A number of urban areas in the eastern part of Virginia had increased in population, and some rural areas, including those in Southside Virginia, had decreased in population. To conform to the constitutional requirements of equal representation, these population shifts required the areas of the electoral districts in Southside Virginia's rural areas to be adjusted to reflect those changes.

The Senate and House Privileges and Election Committees held a joint hearing on February 19, 1991, to receive comments on redistricting criteria. Thereafter, the Senate Privileges and Election Committee (P&E Committee) adopted a resolution (Resolution No. 1) that dealt with the required reapportionment, which contained, among other things, the following pertinent provisions.

## II. CRITERIA

### A. Equal Representation

. . . .

2. Equal population. The populations of the 40 Senate districts shall be as nearly equal as is practicable.

. . . .

### B. Minority Representation

1. Voting Rights Act, §§ 2 and 5. District plans shall not dilute minority voting strength and shall comply with §§ 2 and 5 of the Voting Rights Act. [42 U.S.C. §§ 1971(a)(1)(g)].

### C. Compactness

Districts shall be reasonably compact. Irregular district shapes may be justified because the district line follows a political subdivision boundary or significant geographic feature.

### D. Contiguity

Districts shall be composed of contiguous territory.

. . . .

## III. POLICY CONSIDERATIONS

### A. Political Subdivisions

District plans shall be drawn so as to avoid splitting counties, cities, and towns to the extent practicable.

### B. Communities of Interest

In drawing district plans, consideration shall be given to preserving communities of interest.

### C. Precincts

Precincts . . . should serve as the basic building blocks for districts when it is necessary to split any county or city.

### D. Existing Districts; Incumbency

It is permissible to consider existing districts and incumbency.

Before the special session of the General Assembly was convened on April 1, 1991, the P&E Committee conducted a number of public hearings, held open work sessions, invited public and advocacy group proposals, and publicized its working drafts of reapportionment plans. Thereafter, two "basic objections" were voiced to the P&E Committee's working drafts.

One of those objections was that the draft plans provided for only two black majority districts, although six other senatorial districts contained black populations of 30% to 50%. The other "basic objection" was that the drafts contained allegedly unsatisfactory alignments of districts in Northern Virginia. Later, other plans were presented by a number of senators and by members of the public in an effort to respond to these objections.

After receiving a number of proposals, the General Assembly adopted a reapportionment bill (SB 1501) that, among other things, provided for three black majority districts. On April 19, the Governor vetoed SB 1501 on the ground that it failed to provide for five black majority districts.

Following the veto, the P&E Committee held additional meetings at which it considered further suggestions for creating two additional black majority districts and for realigning the Northern Virginia senatorial districts. The P&E Committee adopted a substitute for SB 1501 that provided for an additional black majority district in Tidewater Virginia, to be known as District 2, and for another black majority district in Southside Virginia, to be known as District 15. District 15 was to include all of Brunswick, Greensville, and Southampton Counties, and the Cities of Emporia and Franklin, parts of Dinwiddie, Isle of Wight, and Sussex Counties, and the Cities of Portsmouth, Chesapeake, and Suffolk. Under this plan District 18 was generally west of District 15, and was to include all of Appomattox, Buckingham, Charlotte, Halifax, Lunenburg, Mecklenburg, Nottoway, and Prince Edward Counties, the City of South Boston, and parts of Dinwiddie County.

When the Senate convened to consider the matter, Senator Clarence A. Holland proposed an amendment to SB 1501 (the Holland amendment) that contained alignments of Districts 15 and 18 and of the districts in Northern Virginia different from those of the P&E Committee. One effect of the Holland amendment was to shift the black majority district from District 15 to District 18. After some discussion on the floor, the Senate approved Senator Holland's amendment.

■ With further amendments not material here, SB 1501, with the Holland amendment, was adopted by both Houses, signed by the Governor, and approved by the Attorney General of the United States on July 16, 1991. Since that time, senators from Districts 15 and 18 have been elected and have served in the 1992 Session of the General Assembly.

The complainants contend that the composition of Senate Districts 15 and 18 violates the compactness requirement of Article II, § 6 because they are not compact either in content or in form. The complainants argue that the word "compact," as used in the term "contiguous and compact territory" in Article II, § 6, means that a senatorial district must not only be "compact in form," it must also be "compact in content." They claim that "compactness [in Article II, § 6] relates not merely to shape but bears also on the relation of the contents of the item being measured." We disagree.

■ In our opinion, the use of the words "contiguous and compact," as joint modifiers of the word "territory" in Article II, § 6, clearly limits their meaning as definitions of spatial restrictions in the composition of electoral districts. Indeed, when we were dealing with the reapportionment policies of minimizing the splitting of counties and cities and of recognizing existing communities of interest in *Brown v. Saunders*, we did not mention them as a part of this constitutional requirement, as the complainants contend. 159 Va. at 37, 166 S.E. at 107-108. Instead, we simply referred to these policies as a "custom" and as a consideration in reapportionment of electoral districts. *Id.*

■ And, in a later reapportionment case, we said that the policy of recognizing communities of interest was not one spelled out in the Constitution. *Wilkins v. Davis*, 205 Va. 803, 810, 139 S.E.2d 849, 853 (1965). Even though we held that this policy was not a constitutional requirement, we recognized that it was one of several factors to be considered in reapportionment cases. *Wilkins*, 205 Va. at 813, 139 S.E.2d at 856.

We turn now to a consideration of the spatial content or form of Districts 15 and 18. Both parties employed expert witnesses on the subject of reapportionment requirements. The complainants' expert was Dr. Thomas M. Guterbock, an assistant professor of sociology at the University of Virginia. The defendants' expert was Kimball W. Brace, President of Election Data Services, Inc.

Brace pointed out that no electoral district territory could be perfectly compact since all points would have to be equidistant from

the center of the district, resulting in circular district boundaries. Brace also testified that no other district shape with some other geometric figure of equal sides could be devised because of limiting geographic factors and constitutional, statutory, and policy considerations that usually make a district larger and more irregular than an ideally compact one.

Brace described one of the limiting geographic factors as the course of state and district boundary lines. He noted that district lines tend to follow natural features like rivers or mountains and thus meander.[2]

 Brace characterized the other factors that militate against compactness as those expressed in Resolution No. 1. Dr. Guterbock and Brace agreed that the General Assembly had to reconcile these considerations that compete with the constitutional requirement of compactness in its attempt to delineate as compact a territory as practicable. Both experts recognized that the mandatory constitutional requirements of equal representation and minority representation meant that rural districts, such as those in Southside Virginia, would compare unfavorably in compactness with urban districts, and with other rural districts that did not have large minority group populations.

In support of his opinion that Districts 15 and 18 were not sufficiently compact in territory, Dr. Guterbock used various mathematical and statistical methods of calculating and scoring deviations of districts as created from that of the ideal, but unachievable, compact district. He then compared the various districts in the 1991 plan, the P&E Committee's plan, and the 1981 district plan with the ideally compact district.

Dr. Guterbock and Brace disagreed about the inferences to be drawn from the comparison of Districts 15 and 18 scores with the scores of other rural districts in the 1991 plan and the other two plans. Because we cannot determine from the cold printed record which expert was the more credible, and because the chancellor saw and heard these witnesses, we must assume that he concluded that Brace's evaluation of the relative weight to be given to these comparisons was more reliable than that of Dr. Guterbock.

 The complainants focused their evidence regarding the issue of community of interest upon District 18. Some of that evidence

---

[2] We note that the 1991 plan uses two rivers in fixing the district boundaries within Mecklenburg and Greensville Counties.

indicated a lack of a significant community of interest among residents of this district. However, the defendants introduced evidence to the contrary. Thus, the evidence was in conflict. For example, witnesses for the complainants disagreed with witnesses for the defendants whether the agricultural and other interests of persons living in the western and eastern parts of District 18 were significantly divergent. We must assume that the chancellor, who heard and saw these witnesses, found that the complainants had not established that those interests were significantly divergent. And his decision on this factual issue is binding upon us.

In addition, witnesses differed as to whether they had or could have communicated more effectively with their state senators under the former alignments of Districts 15 and 18 than under the new alignments. We note, however, that no witness contradicted the testimony of the present senator, who is a resident of Portsmouth in the eastern end of District 18. She had not been elected when she testified, but she indicated that she had made frequent appearances in the western end of the district during her campaign, felt that she had good communication with the residents of that area, and planned, if elected, to be fully accessible to residents in the western area of the district.

Moreover, even if urban residents in the eastern end of District 18 might have some interests different from rural residents in the western end, we cannot assume that the legislature did not consider those differences. Indeed, as the complainants state in their brief, "[t]he idea of communities of interest certainly was considered by the senate in its debates preceding the adoption of the . . . plan." The 1991 plan does split more counties and cities than the plan proposed by the P&E Committee. District 18 is also a district that is longer than any other district in Virginia.

However, this is not a situation like those in *Brown* and *Wilkins* in which two original petitions for mandamus were filed in this Court. There, the evidence showed significant and obvious disparities in the populations of the various congressional districts in violation of the federal and state constitutional requirements of equal representation.[3] Although some effort was made to justify the disparities on the grounds of communities of interest, we held that the

---

[3] The decisions in *Wilkins* and *Brown* were premised upon the violations of § 55 of the 1902 Constitution of Virginia. In part, it required the composition of congressional districts of "contiguous and compact territory containing as nearly as practicable, an equal number of inhabitants." As pertinent, its successor, Article II, § 6, provides that "[e]very electoral

evidence failed to show that the General Assembly could not have adjusted the boundaries of those districts to achieve a more reasonable equality in population. *Wilkins*, 205 Va. at 810, 139 S.E.2d at 854; *Brown*, 159 Va. at 45-47, 166 S.E. at 111.

Here, evidence was introduced from which the chancellor could have concluded that the General Assembly had considered the constitutional requirement of compactness in reconciling the different demands upon it in reapportioning the Senatorial Districts. The territories of Districts 15 and 18 are not ideal in terms of compactness. Nevertheless, we must give proper deference to the wide discretion accorded the General Assembly in its value judgment of the relative degree of compactness required when reconciling the multiple concerns of apportionment. And we must also give proper deference to those parts of the chancellor's decision that were based on conflicting evidence. Accordingly, we cannot say that he erred in holding that Districts 15 and 18 satisfied the compactness requirements of Article II, § 6.

Accordingly, we will affirm the judgment of the chancellor.

*Affirmed.*

---

district shall be composed of contiguous and compact territory and shall be so constituted as to give, as nearly as is practicable, representation in proportion to the population of the district."

Adopted Senate Plans
Districts 15 & 18

District 15

District 18

JUSTICE COMPTON, with whom JUSTICE STEPHENSON joins, dissenting.

Article II, Section 6 of the Constitution of Virginia provides that "[e]very electoral district shall be composed of contiguous and compact territory." In this decision, the majority has written the compactness requirement completely out of the Constitution.

The majority tells us that "the use of the words 'contiguous and compact,' as joint modifiers of the word 'territory' in Article II, § 6, clearly limits their meaning as definitions of spatial restrictions in the composition of electoral districts." Just what the majority means by "spatial restrictions" is not clear. According to the dictionary, the adjective "spatial" means "of or relating to space." Webster's Third New International Dictionary 2184 (1981). Of course, the modifiers "contiguous and compact" relate to space, so the majority has told us nothing by stating that which is obvious.

But in the guise of applying some mystical "spatial" concept, the majority proceeds to wholly disregard the constitutional requirement that the electoral districts at issue be "compact." Among the constitutional defects in the General Assembly's reapportionment plan is the obviously bizarre configurations of the 15th and 18th Districts.

The 15th District crosses 12 counties, only six of which are wholly within the district, and cuts through three independent cities. The 18th District crosses six counties, only two of which are entirely within the district, and six independent cities, only one of which is wholly included in the district. The 15th District is approximately 145 miles long and is only eight miles wide at its narrowest point. The 18th District is 165 miles long, and only five miles wide at some places.

The provisions of the Constitution of Virginia embody limitations upon the legislative power of apportionment, and whether those limitations have been exceeded is a question for determination by the judicial branch of government. *Brown* v. *Saunders*, 159 Va. 28, 35-36, 166 S.E. 105, 107 (1932). Notwithstanding the deference to be accorded an act of the General Assembly and the findings of the trial court, I would decide as a matter of law, given the facts and circumstances of this case, that the legislature has exceeded the constitutional limitation on its power. I would reverse the judgment of the trial court, find that the 15th and 18th Senatorial Districts as presently configured are unconstitutional, and hold that the enactment in question is void and of no effect.