**\*\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\***

**Electronically Filed
Supreme Court
SCPW-22-0000078
09-MAY-2022
08:58 AM
Dkt. 77 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

WILLIAM M. HICKS; RALPH BOYEA; MADGE SCHAEFER; MICHAELA IKEUCHI;
KIMEONA KANE; MAKI MORINOUE; ROBERTA MAYOR; DEBORAH WARD;
JENNIFER LIENHART-TSUJI; LARRY S. VERAY; and PHILIP BARNES,
Petitioners,

vs.

THE 2021 HAWAI'I REAPPORTIONMENT COMMISSION AND ITS MEMBERS;
THE STATE OF HAWAI'I OFFICE OF ELECTIONS; and SCOTT NAGO, in his
official capacity as Chief Elections Officer, State of Hawai'i,
Respondents.

SCPW-22-0000078

ORIGINAL PROCEEDING

MAY 9, 2022

RECKTENWALD, C.J., NAKAYAMA, AND EDDINS, JJ.; WITH McKENNA, J.,
CONCURRING SEPARATELY AND DISSENTING, WITH WHOM WILSON, J.,
JOINS; AND WILSON, J., ALSO DISSENTING SEPARATELY[1]

OPINION OF THE COURT BY EDDINS, J.

Article IV of the Hawai'i Constitution concerns

---

[1]  At the time of this opinion's publication, Justice Wilson's dissent is forthcoming.

reapportionment, the process through which the state's legislators are distributed and its political districts redrawn.

It provides that every ten years a nine-member reapportionment commission (the commission) shall determine the total number of state representatives to which each basic island unit[2] is entitled.  Haw. Const. art. IV, §§ 1, 2 & 4.  This determination is made "using the total number of permanent residents in each of the basic island units" and with the "method of equal proportions."  Id.

Once the commission determines how many representatives each basic island unit is entitled to, it must apportion those representatives within the basic island units.  Id. at § 6.  If there have been population shifts in the decade since the last reapportionment, the commission must redraw district lines to ensure that the "number of permanent residents per member in each district is as nearly equal to the average for the basic island unit as practicable."  Id.

The commission is also tasked with redrawing congressional district lines.  Id. at § 9.

Article IV, section 6 provides eight criteria that the commission "shall be guided by" in effecting redistricting.  The

---

[2]     The four basic island units are: (1) the island of Hawaiʻi, (2) the islands of Maui, Lānaʻi, Molokaʻi and Kahoʻolawe, (3) the island of Oʻahu and all other islands not specifically enumerated, and (4) the islands of Kauaʻi and Niʻihau.  Haw. Const. art. IV, § 4.

2

sixth is that: "[w]here practicable, [state] representative districts shall be wholly included within [state] senatorial districts" (the constitutional district within district guideline). Id. at § 6. Hawai'i Revised Statutes (HRS) Section 25-2(b)(5) (Supp. 2021) (the statutory district within district guideline) similarly requires that "[w]here practicable, state legislative [representative and senatorial] districts shall be wholly included within [U.S.] congressional districts."

On January 28, 2022, the 2021 Hawai'i Reapportionment Commission (the Commission) approved the 2021 Final Legislative Reapportionment Plan (the Plan).

The Plan places 33 of 51 house districts (64.7%) into two or more senate districts. It also places four O'ahu house districts and five O'ahu senate districts into both U.S. congressional districts.

Petitioners, who are registered voters in the State of Hawai'i, argue that the Plan is invalid because it does not give adequate effect to article I, section 6's guidance that "[w]here practicable, representative districts shall be wholly included within senatorial districts." See Haw. Const. art. IV, § 6. They also argue that the Plan violates HRS § 25-2(b)(5) by placing nine O'ahu legislative districts into both congressional

3

districts.[3]  Petitioners say they submitted two plans to the Commission that not only complied with the district within district guidelines, but also had a lower average per-district population deviation than the Plan.  Petitioners say the Commission could have complied with article IV, section 6 and HRS § 25-2(b)(5), it just didn't want to.  Petitioners also argue that less than perfect compliance with one of the district within district guidelines may *only* be justified by the need to comply with the other constitutional and statutory guidelines that govern reapportionment.

The Commission says it satisfied its obligations under article IV, section 6 and HRS § 25-2(b) by considering the constitutional and statutory district within district guidelines (collectively the district within district guidelines) in developing the Plan.  It says Petitioners have not demonstrated that the Commission abused its discretion in discharging its duties and adopting the Plan.

---

[3]     Petitioners also make a third argument.  They claim the Commission unconstitutionally delegated much of its redistricting work and decision making to a committee that consisted of just four of the Commission's nine members.  This argument lacks merit.  The record shows that the Plan was considered by all nine members of the bipartisan Commission and that all nine members of the Commission participated in the vote regarding the adoption of the Plan (eight commissioners voted to adopt the Plan and one voted not to).  The establishment of the technical committee did not represent an unconstitutional delegation of the Commission's power.  To the extent Petitioners raise claims under the Sunshine Law, they are not entitled to mandamus relief because those claims could have been brought in circuit court under HRS § 92-12(c)(2012).

We agree. The constitution and HRS § 25-2(b) mandate that, in redistricting, the commission "shall be guided" by certain enumerated criteria, among them the district within district guidelines. The commission is not required to give the district within district guidelines any particular effect. Nor is it required to disregard factors *other than* the criteria enumerated in article IV, section 6 or HRS § 25-2(b) in redrawing district lines. So the Commission discharged its obligations under article IV, section 6 and HRS § 25-2(b) by considering the district within district guidelines alongside other policy objectives. And, by extension, the Plan is valid.

## I.  BACKGROUND

At its May 17, 2021 meeting, the Commission formed a "technical" committee consisting of four commissioners. The Commission tasked the technical committee with drafting proposed reapportionment plans for the Commission's consideration.

The technical committee presented its proposed reapportionment plans to the Commission at the Commission's January 13, 2022 meeting.[4]

At that same meeting, there was public testimony demanding that the Commission explain its failure to better effectuate the

---

[4]    The technical committee had previously presented other reapportionment plans to the Commission. But these earlier plans had to be amended as a result of updated data received from the military in December 2021 that impacted the Commission's assessment of the number of permanent versus nonpermanent residents in the state.

district within district guidelines.

Responding to this public testimony, Commissioner Nonaka explained that because of the incongruity between the population bases used in congressional districts and those used in state legislative districts, it was not possible, let alone practicable, to have all state districts wholly within a congressional district.

Later at the same meeting, Commission Chair Mugiishi stressed that the Commission was holistically evaluating the constitutional and statutory requirements governing reapportionment and trying to balance them in a way that responded to community concerns. He explained:

> [W]e are as a Commission considering all of those statutory requirements and constitutional requirements that that [sic] is asked of us and we are doing our best to make sure to the extent that it's practicable that we are following them. But sometimes they're in conflict with each other and that's where that's why we have a commission rather than a computer program drawing these lines. It's because human beings who are going to care about people and individual neighborhoods, are going to make judgment calls on what's the best way to make a practical decision about a conflict between two principles. And that's why I think again, and I've said it about four times already, but I really do appreciate the work of the technical committee because they've been doing this now for weeks, months, and for the last few days every single hour of the day to try and consider all of those factors. Because we're going to affect people and that's so we're going to follow the constitution, we're going to follow the law and we're going to do our best to take care of people.

The Commission also met on January 20, 21, 22, and 26, 2022.

At the Commission's January 20, 2022 meeting, Chair Muguiishi read the article IV, section 6 guidelines aloud and

explained that "after due consideration the members of the technical committee believed that the modified proposed plans represent what they the technical committee deemed to be the best, best complies with the constitutional guidelines." Commissioners Ono, Nonaka, and Nekota agreed with the Chair's assessment. Commissioner Nekota added "We really did take public testimony to heart. We did not just go draw lines to draw lines. We really did and follow the Constitution, as we perceive it to be, along with our legal counsel."

During the January 26, 2022 meeting, the technical committee presented and discussed a new version of its proposed final legislative reapportionment plans; the only change it had made to the proposed maps since January 13, 2022, was to the boundaries of House Districts 48 and 49 on O'ahu.

At the January 28, 2022 Commission meeting, the Commission discussed, and then voted to approve, the January 26, 2022 version of the legislative reapportionment plans. In explaining his support for the motion to approve the Plan, Commissioner Chun pointed to the Commission's commitment to ensuring that its redistricting decisions were made in the context of the article IV, section 6 guidelines:

> The constitution states that in effecting such redistricting, the commission shall be guided by the following criteria. It sets forth guidance rather than inflexible standards so as to ensure reasonableness and fairness are always a part of the equation in arriving at redistricting determinations. I have observed complete

> objectivity and clear commitment to ensuring that good
> decisions were made in the context of these guidelines and
> as they were applied to the redistricting maps, so I will
> be pleased today to support the motion [to adopt the Plan].

Shortly after adopting the final reapportionment plan, the Commission authorized staff to make non-substantive changes, including changes to better align the representative district, Senate district, and council district lines. The staff made changes to the Plan so that it would better adhere to the constitutional district within district guideline; following these changes, there are thirty-three (33) House districts that are not wholly inside Senate districts.

Petitioners challenge the Plan on the grounds that it violates article IV, section 6 and HRS § 25-2(b)(5) by failing to place districts within districts even where it would have been practicable to do so. They argue the Commission erred by adopting a Plan that fell short of perfect adherence to the district within district guidelines without justifying the Plan's noncompliance in terms of the need to comply with the other reapportionment "requirements" enumerated in article IV, section 6 and HRS § 25-2(b).

## II. DISCUSSION

We hold that neither article IV, section 6 nor HRS § 25-2(b)(5) places concrete limits on the Commission's discretion to craft a reapportionment plan. The Commission must *consider* the district within district guidelines when redrawing district

8

lines.  But it is not required to give them any particular effect in redistricting.

The existence of alternative plans that hew closer to the district within district guidelines is immaterial to our analysis.  Our task is not to consider the Plan's relative merits in comparison to other options the Commission could have, but did not, adopt.  We consider only whether the Plan is constitutional under article IV, section 6 and legal under HRS § 25-2(b)(5).  See McNeil v. Legis. Apportionment Comm'n of N.J., 828 A.2d 840, 858 (N.J. 2003) ("The judiciary is not justified in striking down a plan, otherwise valid, because a 'better' one, in its opinion, could be drawn." (Cleaned up.)).

Petitioners have not shown that the Commission abused its discretion by disregarding or ignoring the district within district guidelines.  To the contrary, the record suggests that the Commission was aware of, discussed, and considered the district within district guidelines in redrawing district lines and adopting the Plan.  So even though we agree with Petitioners that the Plan does not give full effect to the constitutional district within district guideline,[5] we hold that the Commission

---

[5]  Petitioners' argument that the Plan does not give substantial effect to the statutory district within district requirement is less convincing than its arguments concerning the constitutional district within district guideline: the Plan places 88 percent of state house and senate districts wholly within a single congressional district.

did not abuse its discretion in developing and adopting the Plan.

1.    **Standards of Review**

a.    **We answer questions of constitutional law de novo**

"Issues of constitutional interpretation present questions of law that are reviewed de novo."  League of Women Voters of Honolulu v. State, 150 Hawai'i 182, 189, 499 P.3d 382, 389 (2021) (cleaned up).  This court is the "ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution."  See Ka Pa'akai O Ka 'Aina v. Land Use Comm'n, 94 Hawai'i 31, 41, 7 P.3d 1068, 1078 (2000) (cleaned up). "We answer questions of constitutional law by exercising our own independent constitutional judgment based on the facts of the case."  State v. Hanapi, 89 Hawai'i 177, 182, 970 P.2d 485, 490 (1998) (cleaned up).  Here, this means we give no deference to the constitutional interpretations the Commission implicitly operationalized in developing the Plan.

b.    **We review the Commission's exercise of its discretion using the abuse of discretion standard**

We review the discretionary decisions of public bodies using the abuse of discretion standard.  See Kawamoto v. Okata, 75 Haw. 463, 467, 868 P.2d 1183, 1186 (1994).  In the context of this case, this means we will not substitute our judgment for that of the Commission *with respect to the Commission's exercise*

10

*of discretion given to it by the Hawai'i Constitution.* Instead, our determination of whether the Commission has complied with article IV, section 6 and HRS § 25-2(b) and other applicable laws will hinge on whether the record demonstrates that the Commission either did not consider criteria it was required to consider or, having considered all relevant criteria, made a decision that disregarded the law or exceeded the bounds of reason.[6]

## 2. Reapportionment commissions must <u>consider</u> the district within district guidelines when redrawing districts

Both the constitution and HRS § 25-2(b) frame the district within district guidelines as discretionary, describing them as "criteria" that the commission "shall be guided by" in effecting redistricting. <u>See</u> article IV, section 6; HRS § 25-2(b).

In <u>Save Sunset Beach Coal. v. City & Cty. of Honolulu</u>, 102 Hawai'i 465, 479, 78 P.3d 1, 15 (2003), we considered whether Honolulu's city council erred in zoning land as "country" where

---

[6] This approach is consistent with that used by other courts reviewing the discretionary acts of state reapportionment commissions. <u>See, e.g.</u>, <u>Hartung v. Bradbury</u>, 33 P.3d 972, 981 (Or. 2001) (en banc) (considering constitutional challenges to reapportionment plan and explaining that it would void the plan only if it could "say from the record that the Secretary of State [the reapportioning body] either did not consider one or more criteria or, having considered them all, made a choice or choices that no reasonable Secretary of State would have made"); <u>Jamerson v. Womack</u>, 423 S.E.2d 180, 182 (Va. 1992) ("In this particular litigation, it should be remembered that reapportionment is, in a sense, political, and necessarily wide discretion is given to the legislative body. An abuse of that discretion is shown only by a grave, palpable and unreasonable deviation from the principles fixed by the Constitution." (Cleaned up.)).

only two of the four statutory guidelines provided for identifying potential "country" district lands were met.  We concluded that while the "'use' or consideration" of the statutory guidelines was mandatory, "the ultimate designation decision arising out of that mandatory consideration must, of necessity, involve the exercise of discretion."  Id.  We explained that "guidelines," as used in the statute, "denote[d] individual factors that are not mandatory in themselves, but instead provide direction or guidance with respect to the ultimate decision."  Id.

A similar analysis informs our interpretation of "guided by" as used in article IV, section 6 and HRS § 25-2(b): the reapportionment commission must consider the district within district guidelines and it must use them in developing and adopting congressional and legislative plans.  But the guidelines are not mandatory "in themselves"; rather, they provide "direction or guidance with respect to the ultimate decision."  See id.

The history of article IV, section 6 reflects that the constitutional district within district requirement was not intended to curb the reapportionment commission's discretion to redraw district lines.  After noting that it placed "a number of guidelines for the reapportionment commission to follow when redistricting" into article IV, section 6, the Committee on

12

Legislative Apportionment and Districting clarified:

> It is not intended that these guidelines be absolute restrictions upon the commission excepting for numbers 1, 2, 3 and 7 which are stated in mandatory terms.  The remainder [including the district within district guideline] are standards which are not intended to be ranked in any particular order.  Rather, your Committee believes that <u>they are matters that should be considered in any decision concerning districting and that the balance to be struck among them is a matter for case-by-case determination</u>.  The inclusion of these guidelines is intended to aid the reapportionment commission in maintaining impartiality and objectivity in its own reapportionment plan and <u>to provide the courts with a standard for review of claims of gerrymandering or other unfair or partial result in the apportionment plan</u>.

Supp. Stand. Comm. Report No. 58, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1968, at 265 (1973) (emphases added).  Elsewhere in the same report, the Committee observed that the reapportionment plan it proposed substantially complied with the district within district guideline; but, it remarked, it adopted that criterion "in a more general, less restrictive manner for future reapportionment."  <u>Id.</u> at 247.

Two aspects of this committee report support our conclusion that the constitutional district within district guideline is a factor the commission must consider, not a requirement it must meet.

First, the committee report describes the guideline as a criterion "that should be considered" and recognizes that the extent to which it will be followed in any given reapportionment year is a "matter for case-by-case determination."  <u>Id.</u> at 265. It says it adopted the guideline in a "more general" and "less

restrictive manner for future reapportionment." Id. at 247. Collectively, this language indicates that while the commission must "be guided by" and consider the guideline, the decision to give it effect, or not, remains discretionary.

Second, the report indicates that, in the context of judicial review of reapportionment plans, the purpose of the district within district guideline is "to provide the courts with a standard for review of claims of gerrymandering or other unfair or partial result in the apportionment plan." Id. at 265. This language affirms that the district within district guideline is not an inflexible requirement that the reapportionment commission can fall short of by adopting a plan with too many house districts that span senate district lines. It suggests that the constitutional district within district guideline is, rather, a general guideline or a best practice.

This is not to say that the *effect* the reapportionment commission gives to the district within district guideline will always be immaterial to the question of a reapportionment plan's constitutionality. A reapportionment commission's failure to give full effect to the district within district guideline would be appropriately considered in the context of a claim that a reapportionment plan was unconstitutionally gerrymandered, biased, or otherwise contrary to the equal protection principles that animate article IV, section 6 and article I, section 5.

14

For example, the fact that a reapportionment commission placed nearly two thirds of house districts into two or more senate districts could, if presented alongside other credible evidence of bias, lend substantial support to a claim that a reapportionment plan was unconstitutionally partial to a particular person or party.  But this does not mean that failure to substantially comply with the district within district guideline is, standing alone, a constitutional violation.[7]

Based on the plain language of article IV, section 6 and the framers' intent as revealed by legislative history, we conclude that reapportionment commissions do not have a constitutional obligation to give the district within district guideline any particular effect.  They may not disregard or ignore the district within district guidelines (or the other reapportionment guidelines that are to be followed where "practicable" or "possible").  They must consider them when redistricting and should, where practicable, endeavor to

---

[7]     Justice McKenna's dissent highlights the constitutional district within district guideline's role in "facilitating political organization and developing accountability of senators to communities of common interest." Dissent at 12.

We do not dispute the wisdom of the guideline from a policy perspective.  But the question of whether compliance with the district within district guideline is "normal and preferable," see dissent at 11 (quoting Ethan Weiss, Partisan Gerrymandering and the Elusive Standard, 53 Santa Clara L.Rev. 693, 697 (2013)), is not before us.  And the contention that, from a policy perspective, a reapportionment plan that gives full effect to the district within district guideline would be better than one that doesn't cannot curtail the reapportionment commission's ability to exercise discretion granted to it by the constitution.

15

effectuate them. But they have no rigid statutory or constitutional obligation to effectuate them. Put plainly, the guidelines must shape the reapportionment commission's exercise of its discretion, but they do not impose any hard limits on it.[8,9]

Petitioners' contention that the Commission must "justify" the level of consideration it gave, or did not give, to the district within district guidelines reflects a misunderstanding about both the scope of the Commission's discretion to develop and adopt reapportionment plans and this court's role in reviewing the constitutionality of reapportionment plans. Burns v. Richardson, 384 U.S. 73 (1966), is instructive.

In Burns, the Supreme Court considered the constitutionality of an interim Hawai'i state senate

---

[8]    This analysis concerns the non-mandatory guidelines of article IV, section 6 and HRS § 25-2(b) *only*. The reapportionment commission must give full effect to those constitutional and statutory requirements that are not modified by "where practicable" or "where possible," for example article IV, section 6's requirement that "[n]ot more than four members shall be elected from any district."

[9]    We note that the constitutional district within district guideline is not a general principle bereft of legal force absent implementing laws or statutes. It is, rather, self-executing in that it "supplies a sufficient rule by means of which . . . the duty imposed may be enforced." See Morita v. Gorak, 145 Hawai'i 385, 392, 453 P.3d 205, 212 (2019) (cleaned up). The constitution imposes a duty on reapportionment commissions to "be guided" by the criterion that, "[w]here practicable, representative districts shall be wholly included within senatorial districts." Haw. Const. art. IV, § 6. It also provides the means for the enforcement of that duty. See Haw. Const. art. IV, § 10 ("Original jurisdiction is vested in the supreme court of the State to be exercised on the petition of any registered voter whereby it may compel, by mandamus or otherwise, the appropriate person or persons to perform their duty or to correct any error made in a reapportionment plan . . . .").

apportionment plan.  A three-judge panel of the United States District Court for the District of Hawai'i had disapproved of the interim plan on the grounds that instead of accounting for population increases on O'ahu by creating new single-member senatorial districts for the island, the plan merely increased the number of multi-member senatorial districts on O'ahu from two to five.  Id. at 82.  The district court had concerns about "what it considered to be a difference in representational effectiveness between multi-member and single-members legislative districts."  Id. at 86.  The Supreme Court overruled the district court, explaining that absent evidence of an Equal Protection Clause violation, the district court was wrong to second-guess the legislature's exercise of its discretion to redistrict.[10]  The Court said that given the absence of a showing that the interim reapportionment plan raised equal protection concerns, the district court should not have even required the legislature to justify its reliance on multi-member legislative districts:

---

[10]    The Court explained:

> In relying on conjecture as to the effects of multi-member districting rather than demonstrated fact, the court acted in a manner more appropriate to the body responsible for drawing up the districting plan.  Speculations do not supply evidence that the multi-member districting was designed to have or had the invidious effect necessary to a judgment of the unconstitutionality of the districting.

Burns, 384 U.S. at 88-89.

> Indeed, while <u>it would have been better had the court not insisted that the legislature 'justify' its proposal, except insofar as it thus reserved to itself the ultimate decision of constitutionality vel non</u>, the legislature did assign reasons for its choice. Once the District Court had decided, properly, not to impose its own senate apportionment but to allow the legislature to frame one, <u>such judgments were exclusively for the legislature to make</u>. They were subject to constitutional challenge <u>only upon a demonstration that the interim apportionment, although made on a proper population basis, was designed to or would operate to minimize or cancel out the voting strength of racial or political elements of the voting population</u>.

<u>Id.</u> at 89 (emphases added) (footnote omitted).

This court plays a critical role in ensuring that the voters of our state "choose their representatives, not the other way around." <u>Arizona State Legislature v. Arizona Indep. Redistricting Comm'n</u>, 576 U.S. 787, 824 (2015) (cleaned up). We have intervened, and will continue to intervene, when necessary to ensure that Hawai'i's reapportionment commission creates reapportionment plans that comply with the Equal Protection Clause, the four *mandatory* requirements in article IV, section 6, and all other constitutional and statutory mandates concerning redistricting. <u>Cf.</u> <u>Solomon v. Abercrombie</u>, 126 Hawai'i 283, 270 P.3d 1013 (2012) (holding that reapportionment plan was invalid under article IV, section 4 of our constitution because it included non-permanent residents in the population base for reapportionment). But as <u>Burns</u> makes clear, absent a showing that a reapportionment plan is unconstitutional or illegal we should not second-guess the reapportionment

18

commission's exercise of its discretion to redistrict. Cf. Supp. Stand. Comm. Report No. 58, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1968, at 266 (1973) ("Judicial review is provided in the form of a mandamus to require the commission to do its work, correct any error or effectuate the purposes of the reapportionment provisions contained in the Constitution.")

**3.  The Commission did not abuse its discretion in developing the Plan**

Our constitution requires that the reapportionment commission consider the district within district guidelines. See supra section II(2).  But it does not dictate what that consideration should look like.  Decisions about when and how the guidelines ought to be considered are left to the discretion of the reapportionment commission.

The record in this case shows that the Commission did not abuse that discretion: it adequately considered the constitutional district within district guideline in developing and approving the Plan.

Chair Mugiishi's statements at the January 13, 2022 meeting concerning the Commission's commitment to "consider[ing] all of those factors," "follow[ing] the constitution," and doing its best to "take care of people" speaks to the fact that the constitutional district within district guideline was one of the

factors the Commission considered in exercising its discretion. As does Commissioner Chun's remark at the January 28, 2022 meeting that he had "observed complete objectivity and clear commitment to ensuring that good decisions were made in the context of these guidelines and as they were applied to the redistricting maps."

The Commission's consideration of the constitutional district within district guideline is also evidenced by the fact that after the January 28, 2022 approval of the Plan, Commission staff made minor changes to the Plan in order to improve its compliance with the constitutional district within district guideline. If the Commission was indifferent to the guideline it would not have tweaked the Plan to better comply with it.

Finally, declarations provided by members of the Commission's technical committee speak to the Commission's consideration of the district within district guidelines. Commissioner Nonaka declared that:

> the Technical Committee was guided by the applicable constitutional and statutory provisions, including the eight (8) criteria listed in Article IV, Section 6 of the Hawai'i Constitution. We considered the criteria to comply with the Constitution while striving to produce plans that would best serve the State as a whole. The Technical Committee also did its best to be responsive to public testimony while following the criteria.[11]

---

[11] In explaining why the Commission declined to more perfectly adhere to the constitutional district within district guideline, Commissioner Nonaka said that "it would be extremely difficult to consider other crtieria [sic] if that one principle was used as a guiding factor. The Commission would have to prioritize drawing arbitrary lines without regard for community input."

Commissioner Ono, who like Commissioner Nonaka was on the technical committee, declared that the committee considered the district within district guidelines in developing the Plan and that, in her opinion, the Plan "achieve[s] the overriding objective of voter equality and best represent[s] the balancing of constitutional and statutory redistricting criteria."

Petitioners may disagree with the weight the Commission assigned to the district within district guidelines, but they have not shown that the Commission disregarded them in developing and adopting the Plan. To the contrary, the record reflects that the Commission holistically considered the district within district guidelines when exercising its discretion to develop and adopt the Plan. The Commission's consideration of the district within district guidelines was thus adequate under both article IV, section 6 and HRS § 25-2(b)(5).[12]

---

[12] We base this holding solely on the information in the record concerning the Plan's development. The Commission's argument that the Plan is constitutional because the number of state house districts split by state senate districts in the Plan (33) is in line with that found in previous reapportionment plans lacks merit. The Commission is right that the Plan's compliance with the constitutional district within district guideline is similar to that of the 2012, 2001, and 1991 reapportionment plans, which split 30, 31, and 38 state house districts across state senate districts. But this fact has no bearing on our analysis: even the most longstanding practice cannot transform unconstitutional actions into constitutional ones.

21

**4.     The Commission did not abuse its discretion by considering factors other than those enumerated in article I, section 6 and HRS § 25-2(b)**

The Commission <u>must</u> consider the article IV, section 6 and HRS § 25-2(b) guidelines in reapportionment. But it is not prohibited from pursuing other rational and non-discriminatory policy goals through its redistricting.[13] So Petitioners' claim that the Plan is invalid because the Commission unlawfully allowed its "preference" for preserving legacy districts to get in the way of drawing a reapportionment plan that better effectuated the district within district guidelines has no merit.

There are two reasons why the Commission did not abuse its discretion by crafting and adopting a plan that sought the preservation of legacy district boundaries.

First, the constitution explicitly contemplates that <u>re</u>apportionment will involve the <u>re</u>drawing of district lines.

---

[13]     <u>McNeil</u> provides a good example of a rational state policy that the reapportionment commission <u>must</u> consider alongside article IV, section 6 and HRS § 25-2(b)'s requirements and guidelines: compliance with the federal Voting Rights Act. In <u>McNeil</u>, the New Jersey Supreme Court considered a challenge to the New Jersey constitution's requirement that no county or municipality should be divided between legislative districts. Under New Jersey's constitution, "[u]nless necessary to meet the [contiguity, compactness or equal population] requirements, no county or municipality shall be divided among Assembly districts unless it shall contain more than one-fortieth of the total number of inhabitants of the state." 828 A.2d at 845 (cleaned up). The court held this constitutional requirement was preempted by the federal Voting Rights Act, since full compliance with it would result in the "packing" of minority voters and the dilution of their electoral influence. <u>Id.</u> at 857.

See Haw. Const. art. IV, § 6 ("Upon the determination of the total number of members of each house of the state legislature to which each basic island unit is entitled, the commission shall apportion the members among the districts therein and shall redraw district lines where necessary [to equalize the population in each district as much as practicable]." (Emphasis added.)). This use of the word "redraw" presumes that existing districts may serve as the starting point for redistricting. The commission is required to consider the constitutional district within district guideline in adjusting district lines to account for population changes since the last reapportionment; but because it is tasked with redrawing it is also implicitly authorized to consider the boundaries of existing legislative districts.

Second, the Supreme Court has recognized that "preserving the cores of prior districts" is a legitimate state legislative policy that may justify minor deviations from the requirement that each district should have an equal population. In Karcher v. Daggett, 462 U.S. 725 (1983), the court explained that it was "willing to defer to state legislative policies, so long as they are consistent with constitutional norms, even if they require small differences in the population of congressional districts." Id. at 740. The court continued, explicitly recognizing that keeping legacy districts intact was a "legitimate objective:"

23

> Any number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, <u>preserving the cores of prior districts</u>, and avoiding contests between incumbent Representatives. As long as the criteria are nondiscriminatory, these are all legitimate objectives that on a proper showing could justify minor population deviations.

<u>Id.</u> (emphasis added)(citation omitted).

To the extent that the reapportionment commission sought to preserve legacy districts, that was a "legitimate objective." <u>See</u> <u>id.</u>; <u>see also</u> <u>Chapman v. Meier</u>, 407 F.Supp. 649, 664 (D.N.D. 1975) (adopting a court-ordered apportionment plan and explaining that though the court had "altered most of the existing legislative districts to comply with the one man-one vote standard" it also "endeavored to retain the core of existing districts in the new reapportionment plan" so that "extreme disruption in the election processes may be avoided").

We see no reason to conclude that article IV, section 6 or HRS § 25-2(b) limit the commission's discretion to craft a reapportionment plan that complies with constitutional equal protection mandates, strictly conforms to the mandatory requirements of article IV, section 6 and HRS § 25-2(b), and also seeks to promote stability by preserving legacy districts.

24

## III. CONCLUSION

The Plan complies with article IV, section 6 and HRS § 25-2(b); Petitioners have not shown that they are entitled to the requested relief.  The Petition is denied.

| | |
|---|---|
| Mateo Caballero,<br>for petitioners | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Lauren K. Chun<br>(Patricia Ohara, Lori N.<br>Tanigawa, and Reese R. Nakamura<br>on the briefs),<br>for respondents | /s/ Todd W. Eddins |

